# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **DAVID W. LARSEN,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05 C 5063 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **MICHAEL J. ASTRUE,** Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, David W. Larsen ("Larsen"), seeks judicial review of the final decision of the

Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the

"Commissioner"), who determined that Larsen was not entitled to Disability Insurance Benefits

("DIB") or Supplemental Security Income ("SSI"). The Commissioner moves this Court to

uphold his decision. The parties have consented to have this Court conduct any and all

proceedings, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(b).

For the reasons set forth below, the Court vacates the Commissioner's final decision and remands

this case for further proceedings.

## I. Background

### A. Procedural History

Larsen filed an application for SSI benefits on or about April 2, 2003, claiming that he

was disabled as of January 1, 2003. (R. at 41.) The Commissioner denied Larsen's claims

initially on May 28, 2003, and on reconsideration on October 9, 2003.[1] (R. at 30, 35.) Larsen

requested a hearing before an administrative law judge, and a hearing was held in Oakbrook,

Illinois, on October 12, 2004 before Judge John L. Mondi (the "ALJ"). (R. at 39, 198.) Larsen

was represented at the hearing by counsel and testified, as did his father, William Larsen. (R. at

13). At the conclusion of the hearing, the record was left open to allow Larsen to provide

additional medical evidence, which he did. (R. at 202.) On February 10, 2005, the ALJ found

Larsen not disabled because he could perform a significant number of light work jobs in the

national economy. (R. at 17-18.) The ALJ's ruling became the final decision of the

Commissioner on July 14, 2005 when the Appeals Council denied Larsen's request for review.

(R. at 5-7.)

### B.     Factual Background

#### 1.     Education and Work History

Larsen was born on October 12, 1964 and was forty years old at the time of the hearing.

(R. at 205.) Larsen has a high school diploma and has undergone some training in motorcycle

and engine repair. (R. at 57.) After high school, from October 1985 through October 1989,

Larsen operated a pizza business that was financed by his parents. (R. at 52, 213.) In this job, he

took phone orders, made pizza, and did any necessary physical work. (R. at 59, 213.) Because

money "disappeared," either through theft or loss, Larsen's parents managed the cash register.

(R. at 214.) Larsen eventually sold this business for health reasons. (R. at 164.)

---

[1] The Court retrieves these dates from the dates stamped on the respective documents.

Beginning October 1989, Larsen worked as a self-employed handyman, earning $300 per month. (R. at 52.) He has not had significant employment since he remodeled an office in approximately 1994; since the alleged onset of his disability in January 2003, Larsen has not been involved in work lasting more than two days. (R. at 206-07.) Larsen's jobs have not provided a consistent income, and have allowed Larsen to earn thirty to fifty dollars a week "on and off." (R. at 205.)

### 2. Medical Evidence

On April 29, 2003, psychiatrist Dr. Joseph Nemeth performed a consultative evaluation at the request of the Illinois Department of Disability Determination Services ("DDS") and found that Larsen had recurrent major depressive disorder. (R. at 16, 131-32.) This was Larsen's first mental health diagnosis.[2] According to Dr. Nemeth's report, Larsen stated that he began noticing his depression in approximately 1993. (R. at 131.) Since then, he has had difficulty concentrating and low self-esteem, and he has experienced fatigue, mood swings, insomnia, a pre-occupation with pain and discomfort, and shortness of breath. (*Id.*) Larsen did not report any manic symptoms, but Dr. Nemeth indicated that Larsen had "mild suicide ideation." (R. at 132.) Dr. Nemeth noted that Larsen appeared unkempt and poorly groomed. (*Id.*) Larsen knew the date, could perform simple mathematical calculations, and remembered three items after

---

[2] Larsen was raised a Christian Scientist and did not visit doctors until he "absolutely had to." (R. at 131, 169, 215.) Consequently, Larsen does not have an extensive medical history. Also, Larsen was adopted as an infant and has no knowledge of his biological parents' medical history. (R. at 131, 165.)

- 3 -

three minutes. (*Id.*) He had difficulty interpreting the phrase, "a rolling stone gathers no moss." (*Id.*) Finally, Dr. Nemeth found that Larsen was incapable of handling his own funds. (*Id.*)

Upon examining Larsen's records, DDS psychologist Dr. Tyrone Hollerauer conducted a mental residual functional capacity assessment ("RFC") on May 17, 2003. (R. at 133.) Dr. Hollerauer found that Larsen may have some difficulty working with others, but Larsen appeared cognitively intact regarding his memory and he could concentrate and maintain a pace normally required to perform substantial gainful activity. (R. at 135.) Dr. Hollerauer also completed a psychiatric review technique form ("PRTF") and determined that Larsen suffered from an affective disorder resulting in "mild" restrictions of daily activities, "mild" difficulties in maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence or pace, and "no" episodes of decompensation of extended duration. (R. at 147.) DDS psychologist Dr. D. Galassi-Hudspeth affirmed these conclusions on September 23, 2003. (R. at 137.) On May 20, 2003, DDS examiner Dean Olive and medical specialist Dr. Frank Jimenez found that Larsen was not disabled and diagnosed him with affective/mood disorders. (R. at 28.) Larsen's disability application was subsequently denied. (R. at 30.)

Upon reconsideration of his application, Larsen visited Dr. Ravikiran Tamragouri for a consultative physical examination on September 3, 2003. (R. at 151.) At this point, Larsen was not taking prescription medications, although he had been taking Vicodin previously. (*Id.*) Larsen reported arthritis in his hands, hips, and ankle; shortness of breath with inability to walk half a block or less; chest pain at night; having "no energy"; and pain in his left leg and knee. (*Id.*) He also cited his inability to stand up from a kneeling position. (*Id.*) Dr. Tamragouri noted that Larsen did not use an ambulatory assist device to walk. (R. at 152.) Cardiac, neurological,

- 4 -

and musculo-skeletal exams returned normal results, with muscular pain found in the posterior thigh of the left knee. (R. at 151-52.) Dr. Tamragouri found that Larsen experienced myofascial pain of "uncertain significance" and that his chest pains and shortness of breath appeared to be non-cardiac or pulmonary related. (R. at 153.) He speculated those issues could have been based on Larsen's myofascial pain, overweight status, and lack of conditioning. (*Id.*)

On September 25, 2003, DDS examiner Douglas Sutphen diagnosed Larsen with affective/mood disorders with a secondary diagnosis of myofascial pain, but he again found that Larsen was not disabled. (R. at 29.) Medical specialist Dr. T. Arjman verified this assessment the next day. (*Id.*) Subsequently, Larsen's disability application was denied a second time on October 9, 2003. (R. at 35.)

Beginning in 2004, Larsen sought treatment outside the DDS. He visited Martin T. Russo Family Health Center at least five times beginning January 8 and lasting until August 31, 2004. Larsen reported that he had trouble breathing, felt weak, and woke up in the middle of the night. (R. at 181.) He also experienced pain in his wrists and neck and claimed that his hands felt "broken." (R. at 180.) Laboratory tests indicated Larsen's ECG was normal and that his ANA was negative. (R. at 176, 182, 187.) Larsen scored a 5/5 grip strength. (R. at 177.) He was diagnosed with polyarthralgia and was given samples of Celebrex. (R. at 180.) Larsen was also prescribed Zoloft and Ambien. (R. at 179.)

Larsen visited DuPage County Health Department's Mental Health Services on July 22, 2004 to "feel better" and "get back" to work as well as to obtain assistance with his SSI application. (R. at 154.) At the evaluation, Larsen reported experiencing symptoms of depression and hypomania since 1988 that had become increasingly severe. (R. at 160, 171.)

- 5 -

Larsen's depressive symptoms included lack of energy and motivation, diminished interest, increased appetite, worry, difficulty concentrating and focusing on tasks, and poor memory. (R. at 160.) Larsen reported having consistent auditory hallucinations of negative comments three to four times a month. (*Id.*) His hypomania symptoms included elevated spurts of energy, a history of overspending, irritability, heightened anxiety, risky and reckless driving, and racing thoughts that prevent him from falling asleep. (*Id.*)

Staff Psychiatrist Dr. Michael Swain diagnosed Larsen with bipolar II disorder and joint, muscle, and chest pain. (R. at 176.) Dr. Swain stated that Larsen's hallucinations appeared to have begun only six weeks prior to his examination. (R. at 175.) He found that Larsen had normal attention and concentration, was fully oriented to time, person, and place, and had good problem solving and judgment concerning everyday activities and social situations. (R. at 175-76.) He also assessed Larsen's global assessment of functioning at a level of 50.[3] (R. at 161.) Larsen's memory was not tested. (R. at 176.)

Dr. Swain noted that Larsen's medications were helping his depressive symptoms and sleep anxiety.[4] (R. at 175.) He prescribed Larsen Zoloft, Lithium, and Trazodone. (R. at 176.) Dr. Swain also recommended treatment and follow-up with Dr. Elias Haddad and with a counselor at the clinic. (*Id.*)

_____

[3] A global assessment of functioning ("GAF") is used "to report the clinician's judgment of the overall level of functioning." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, TEXT REVISION 32 (4th ed. 2000). A rating of 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shop lifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

[4] Larsen had been taking Zoloft to treat his depressive symptoms and Ambien to help reduce his sleep anxiety. (R. at 176.)

Larsen visited staff psychiatrist Dr. Haddad at least three times around July through November 2004 for the purposes of medication management and supportive treatment of Larsen's Bipolar II Disorder. (R. at 173.) Dr. Haddad noted that Larsen had the mental status "of an alert, well oriented, verbal, 39 year old white male." (*Id.*) Larsen's memory was good for the recent and remote, and he exhibited average intellect. (*Id.*) Larsen's judgment was adequate, and his insight was lacking. (*Id.*) Larsen denied delusions, hallucinations, and suicidal or homicidal ideation. (R. at 189.) Dr. Haddad noted that Larsen was "nonfunctional" for "three or four years" and "should have been treated a long time ago with medication." (R. at 188-89.) Dr. Haddad kept Larsen on the regimen of Zoloft, Trazadone, and Lithium. (R. at 173, 188-89.)

Dr. Haddad completed a Psychological/Psychiatric Medical Impairment Evaluation on November 30, 2004. (R. at 190-94.) Dr. Haddad stated that Larsen began suffering from Bipolar II Disorder "10 to 15 [years] ago," and the diagnosis was expected to last for a year or more. (R. at 190.) Larsen exhibited persistent depressive and manic syndrome characterizations. (R. at 190-91.) Medication or treatment had eliminated the depressive symptoms "modestly" and the manic symptoms "some." (R. at 191.)

Dr. Haddad found that Larsen's condition resulted in marked restrictions of activities of daily living, to the level that it was "increasingly difficult, if not impossible" for Larsen to work. (R. at 192.) Dr. Haddad also believed that Larsen exhibited "great difficulties" in maintaining concentration, persistence, or pace. (*Id.*) Larsen did not have marked difficulties in maintaining social functioning and did not experience repeated episodes of decompensation lasting two weeks or more. (R. at 193.) However, Dr. Haddad found that Larsen experienced more frequent episodes of decompensation of a lesser duration, explaining that Larsen "becomes afraid to go

- 7 -

out, isolates himself, has difficulty sleeping, and experiences inexplicable weakness of hands and limbs." (*Id.* (alterations omitted).)

## C. Larsen's Hearing Testimony

At the time of the hearing, Larsen had been living in the Stardust Motel in Naperville, Illinois, for approximately two and a half months. (R. at 204-05.) Larsen testified that he lived with his parents until he was thirty and moved out because there was not enough room in their condominium. (*Id.*) In between residing at his parents' home and the Stardust Motel, Larsen had been evicted from several residences, including a Days Inn, an apartment in Wheaton, Illinois, and an apartment in Glenn Ellen, Illinois. (R. at 215-17.) Larsen also stayed at a homeless shelter and with a friend for short periods of time. (R. at 216-17.)

Outside of his limited income, Larsen has been supported financially by his father, through church funds, and by food stamps. (R. at 217-18.) Larsen also has sold many of his tools and equipment to raise money. (R. at 215.) His father often provides his transportation and handles his finances. (R. at 212, 222-23.) Larsen stopped driving a year before the hearing because of traffic violations. (R. at 211.) He sometimes gets lost when he uses public transportation. (R. at 223.)

Larsen stated that he usually spends his days inside, sometimes a week to ten days at a time. (R. 225.) He bathes once every three or four days. (R. at 227.) Occasionally he visits with his grandmother. (R. at 212.) Larsen likes to read, but it takes him up to two or three days to read a page in a book and he has difficulty remembering what he read. (R. at 224.) He does not watch movies because he "get[s] confused" and cannot follow along. (*Id.*)

- 8 -

Larsen testified that he lost "one by one" the regular clients for whom he had done work. (R. at 221-22.) He would not show up on time to appointments, would forget about his clients, and would leave jobs unfinished. (R. at 221.) He can no longer prepare estimates. (R. at 222.) Larsen has to be reminded by his father of his appointments, otherwise he forgets. (*Id.*)

Larsen cited his depression as the reason for his sporadic work experience because "[he] just can't get up and get going." (R. at 207.) Larsen also stated that his persistent chest and hand pain prevent him from working because "they hurt just all day long." (*Id.*) He testified that he sold his pizza business because he physically and mentally could not meet the job's demands. (R. at 208.) Larsen further described having pain in his joints, elbows, wrists, feet, ankles, hips, and knees that prevent him from sleeping. (*Id.*) Walking long distances is a "very big problem." (R. at 209.) Sometimes walking from his car to the front door of his home causes Larsen to be out of breath and experience pain. (R. at 210.) Larsen also has trouble carrying things because of the pain in his hands. (*Id.*)

Larsen stated that he could lift a maximum of about twenty pounds without experiencing pain for days afterwards. (R. at 228.) Larsen has difficulty getting up from a bending, stooping, or kneeling position. (*Id.*) He cannot hold a pen to write. (R. at 229.)

Larsen testified that his medications have not made a difference to treat his physical pain. (R. at 209.) His sleeping pills did not have an effect anymore. (*Id.*) Zoloft helped Larsen with his depression symptoms at first, but stress puts him "right back at zero again." (*Id.*)

### D. William Larsen's Hearing Testimony

William Larsen confirmed his son's testimony describing Larsen's work history. (R. at 213.) William Larsen added that he guides his son "considerably," such as by calling in advance and reminding Larsen of doctor appointments. (*Id.*) William Larsen must handle Larsen's money, otherwise it "disappears." (R. at 231-32.) William Larsen confirmed that he supports Larsen financially and provides transportation. (R. at 230-31.) William Larsen financed Larsen's pizza business and handled the financial part of it with his wife. (R. at 213.) Sometimes William Larsen and his wife have to shop for their son and bring him food. (R. at 234.)

William Larsen testified that he noticed that Larsen has had difficulty walking since the year preceding the hearing. (R. at 236.) William Larsen would observe Larsen hobble and get winded, and Larsen would then have to stop to rest; this happened particularly when Larsen used stairs or walked a distance of over a few hundred feet. (R. at 236-37.) William Larsen also testified that Larsen exhibited difficulty using his hands, and he cited Larsen's inability to grip a hammer. (R. at 237.)

## II. ALJ's Findings

The ALJ made the following specific findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant has medically determinable impairments, bipolar and myofascial pain disorders, that are a "severe" impairment, based on the requirements in the Regulations [20 CFR § 416.920(b)].

3. The claimant's impairments do not meet or medically equal, even in combination, any impairment listed in Appendix 1, Subpart P, Regulation No. 4.

4. The claimant's allegations regarding limitations and disability are not credible for reasons set forth in the body of the decision.

5. The claimant has at least the residual functional capacity for light work subject to a limited ability to carry out detailed instructions.

6. The claimant is unable to perform any past relevant work (20 CFR § 416.965).

7. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 416.963), has a "high school education" (20 CFR § 416.964), and lacks acquired transferable skills from past work (20 CFR § 416.968).

8. The claimant has the residual functional capacity to perform substantially the full range of light work (20 CFR § 416.967).

9. Based on claimant's residual functional capacity, age, education, work experience, and Medical-Vocational Rule 202.20 in Appendix 2 of Subpart P in Regulations No. 4, he is "not disabled" under the Act.

10. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

(R. at 18-19.)

The ALJ concluded that Larsen is not eligible for SSI payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act. (R. at 19.) Larsen disputes the ALJ's finding and argues that the ALJ's decision must be remanded. For the reasons set forth below, the Court vacates the Commissioner's final decision and remands this case for further proceedings.

## III. <u>Discussion</u>

### A.  **Standard of Review**

42 U.S.C. § 405(g) authorizes judicial review of the Commissioner's decision to deny

Social Security benefits.  The Commissioner's decision must be supported by substantial

evidence.  *See Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *see also* 42 U.S.C. § 405(g).

Substantial evidence requires "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court must consider all the

evidence in the record, but may not "reweigh the evidence, resolve conflicts, decide questions of

credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227

F.3d 863, 869 (7th Cir. 2000).  The Court reviews the Commissioner's conclusions of law under

a *de novo* standard; where the Commissioner commits an error of law, the Court may reverse the

decision "without regard to the volume of evidence in support of the factual findings." *White v.

Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

Although this "substantial evidence" standard of review is deferential, the Court must not

merely "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th

Cir. 2002).  The ALJ must minimally articulate the reasons for her decision. *Dixon v. Massanari*,

270 F.3d 1171, 1176 (7th Cir. 2001).  This standard is met so long as the Court is able to trace

the ALJ's path of reasoning and is satisfied that the ALJ considered all important medical

evidence. *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995).

## B.    Five-Step Inquiry

In order to qualify for disability payments, an individual must establish that she is disabled within the meaning of the Social Security Act. "Disability" is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months."[5] 20 C.F.R. § 404.1505(a). Substantial gainful activity includes any other substantial work that exists in the national economy in addition to the individual's previous work. 20 C.F.R. § 404.1505(a). Social Security regulations provide a five-step sequential inquiry for determining whether a claimant is disabled. In following the five steps, the ALJ considers

> 1) whether the claimant is currently [un]employed; 2) whether the claimant has a severe impairment; 3) whether the claimant's impairment meets or equals one of the impairments listed [in 20 C.F.R. § 404, Subpt. P, App. 1]; 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing work in the national economy.

*Clifford*, 227 F.3d at 868 (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)). The claimant bears the burden of proof at steps one through four. *Id.* The burden shifts to the Commissioner at step five to prove that the claimant can perform existing jobs in the national economy. *Id.*

---

[5] "Substantial gainful activity" is defined as work that involves significant and productive mental duties and is done or intended to be done for pay or profit. 20 C.F.R. § 404.1510.

At the fourth and fifth steps of the disability inquiry, the ALJ must make an assessment of the claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iv)-(v). The RFC is an assessment based on all the relevant evidence of what work-related activities the claimant can perform despite her limitations. *Id.* § 404.1545(a)(1); *see also Dixon*, 270 F.3d at 1178. The RFC allows the ALJ to evaluate the type of employment available to an individual with particular limitations. 20 C.F.R. § 404.1545(a)(5).

## C.    ALJ's Step Three Determination

Larsen argues that the ALJ improperly conducted his analysis at step three. Larsen gives two arguments as to why the ALJ's step three analysis was insufficient. Larsen argues first that ALJ's articulation of his step three analysis failed to cite the listing under which the ALJ considered Larsen's impairments and that the analysis was otherwise perfunctory. Second, Larsen argues that the ALJ's reasoning improperly discounted evidence from Dr. Haddad.

### 1.    No Listing Cited

As stated above, step three requires the ALJ to consider a claimant's impairments in light of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See Scott*, 297 F.3d at 594-95. The Court refers to these listed impairments as the "Listings." Here, the ALJ stated that Larsen's impairments—specifically his bipolar disorder and myofascial pain—are severe but "do not meet or medically equal, even in combination, [a Listing]." (R. at 15.) The ALJ then stated that this conclusion was "consistent with the assessments of reviewing DDS physicians and the medical evidence, as will be shown." (*Id.*) Larsen argues that this articulation is deficient.

First, the Court addresses the ALJ's failure to identify the Listing that he considered in determining that Larsen's impairments do not meet a Listing. Although the Seventh Circuit has declined to hold the ALJ's failure to identify the pertinent Listing automatically warrants remand, the Court must reverse and remand "where an ALJ omits reference to the applicable listing and provides nothing more than a superficial analysis." *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004). The question in this case becomes whether the ALJ's analysis is superficial, such that remand is required. Essentially, in considering whether the ALJ's analysis is "superficial," the Court must be satisfied that the ALJ evaluated Larsen's impairments in light of the appropriate listing, even thought that listing is not named in the ALJ's opinion. *See id.* at 370.

The Listing that covers bipolar disorder and on which Larsen relies is Listing 12.04. Listing 12.04, in relevant part, states that a claimant meets this Listing if she can show that she meets several criteria in part A as well as two of four criteria in part B. Part B indicates that the criteria in part A must result "in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.04. The Commissioner's Response indicates that the focus of the ALJ's analysis surrounds his implicit decision that Larsen did not meet part B. (Def.'s Resp. at 8 ("Even assuming Plaintiff could establish the criteria for Part A of the Listing, the ALJ expressly found that Plaintiff did not meet or equal Part B of the Listing.").)

The Court is confident that the ALJ considered the medical evidence in light of the criteria of Listing 12.04. First, in his statement that Larsen's impairments do not meet or equal a

- 15 -

Listing, the ALJ stated that he considered Larsen's bipolar disorder and myofascial pain in making his determination. (R. at 15.) This indicates that the ALJ considered the appropriate Listing—Listing 12.04—as opposed to some other unrelated listing.

More substantively, although the portion of the ALJ's opinion wherein the ALJ states his conclusion does not contain significant analysis, this portion directs the reader to continue reading to gather the ALJ's analysis. This is clear because the ALJ states that his conclusion is consistent with the opinions of the DDS physicians and medical evidence, "as will be shown." The Court believes that the ALJ's directing the reader to look ahead in the opinion for more analysis is appropriate; indeed, in determining whether an ALJ has properly supported his conclusions, the Seventh Circuit makes clear that the Court will not "nitpick," but will read the ALJ's opinion as a whole. *Rice*, 384 F.3d at 369 (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).

To support his decision, the ALJ relied on the PRTF assessment completed by the DDS physicians, which spoke specifically to the functional limitations addressed in the Listing's part B. (R. at 16, 147.) Specifically, the ALJ stated that the DDS physicians "concluded that claimant had a severe mental impairment resulting in 'mild' restrictions of daily activities, 'mild' difficulties in maintaining social functioning, and 'moderate' difficulties in maintaining concentration, persistence or pace, and 'no' episodes of decompensation of extended duration." (R. at 16.) The ALJ also discussed the context of the DDS physicians' evaluations of Larsen, as well as the symptoms that Larsen reported to the DDS physicians at these evaluations. Based on this analysis, the ALJ adopted the DDS physicians' determinations as to the criteria in part B of Listing 12.04.

- 16 -

The Court believes that this analysis is neither superficial nor perfunctory. The ALJ explains what evidence he bases his decision on—the DDS physicians' testimony—and how he concludes that Listing 12.04 is met. Although the ALJ does not name Listing 12.04, the ALJ's decision satisfies the Court that the ALJ considered Listing 12.04.

### 2. Conflicting Testimony

Although the ALJ's step three determination was not perfunctory, the Court believes it is deficient because the ALJ failed to articulate the bases for his assigning relative weight to the evidence he considered. Larsen points to evidence from Dr. Haddad—Larsen's treating physician—who found that Larsen did have marked restrictions of activities of daily living; marked difficulties in maintaining concentration, persistence, or pace; and "[m]ore frequent episodes of decompensation of a lessor duration [i.e., fewer than three per year]." (*See* R. at 192-93.) In other words, unlike the evidence from the DDS physicians, evidence from Dr. Haddad indicates that Larsen does in fact meet the requirements of Listing 12.04.

The ALJ is responsible for weighing conflicting medical evidence throughout the disability inquiry. *See* 20 C.F.R. § 404.1527(c)(2). In adopting the diagnoses of the DDS physicians, the ALJ discredited the opinion of Dr. Haddad. The ALJ reasoned that Dr. Haddad's opinion is "not well supported or indicative of a condition that would preclude all work for a 12-month period with treatment. Indeed, Dr. Haddad only started seeing claimant in July 2004, at which time claimant apparently was without medication and, moreover, subsequently improved with medication." (R. at 17.) The issue thus becomes whether the ALJ properly accorded Dr. Haddad's opinion reduced weight.

Larsen argues that the ALJ "cannot reject the opinions of the treating physician without substantial evidence and explanation of the weight accorded to that opinion." (Pl.'s Reply at 3.) The Seventh Circuit has recently addressed this issue. In *Hofslein v. Barnhart*, 439 F.3d 375, 376-77 (7th Cir. 2006), the Seventh Circuit stated that "the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances." The court recognized that 20 C.F.R. § 404.1527(d)(2) appears to suggest a "treating physician" rule, in which the treating physician's testimony is to be given controlling weight if it is well supported and not inconsistent with other evidence. *Id.* at 376. Instead of attaching a presumptive weight to a treating physician's testimony, the *Hofslein* court directs the ALJ simply to consider the factors listed in 20 C.F.R. § 404.1527(d) that inform the proper weight a treating physician's testimony should receive. These factors include the length, nature, and extent of the treatment relationship, the supportability and consistency of the testimony, the treating physician's specialization, and "other factors."

Courts before and after *Hofslein* have noted or assumed that the ALJ must articulate his reasons for discounting a treating physician's testimony. *See Dixon*, 270 F.3d at 1177 ("Thus, because she supported it with substantial evidence, the ALJ was not patently wrong in determining that Voss' opinion was not, given all the other facts, entitled to controlling weight."); *Rogers v. Barnhart*, 446 F. Supp. 2d 828, 853 (N.D. Ill. 2006) ("[T]he ALJ carefully explained her reasons for discounting Dr. Riley's opinion."); *Ozier v. Barnhart*, No. 03 C 2988, 2004 WL 2038540, at *6 (N.D. Ill. Aug. 11, 2004) ("When the ALJ, however, decides against giving the treating physician's testimony controlling weight in favor of a consultative doctor's evidence, he

must articulate logical reasons for this determination.") (citing 20 C.F.R. § 416.927(d)(2); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)).

In this case, the ALJ did not sufficiently articulate his reasons for according Dr. Haddad's testimony reduced weight. First, the ALJ's statement that Dr. Haddad's opinion "is not well supported or indicative of a condition that would preclude all work for a 12-month period with treatment" does not itself give insight into the ALJ's reasoning. The Court views this language as a segue into the ALJ's discussion of the more specific reasons for reducing the weight of Dr. Haddad's evidence. Substantively, the ALJ reasons that Dr. Haddad's testimony is not weighty because Dr. Haddad began treating Larsen prior to Larsen's taking medications and Larsen's condition improved with his use of medication. This reasoning is belied by the facts. The record makes clear that, at the time Dr. Haddad began seeing Larsen, Larsen had been taking prescription medications. Larsen's use of medication is noted on Dr. Haddad's reports.[6] The ALJ's reasoning is not supported by the record, and it therefore does not support the ALJ's decision to give Dr. Haddad's testimony reduced weight. The Court recognizes that the ALJ states that Dr. Haddad began treating Larsen in July 2004. Although this fact might suggest that the ALJ was considering the length of Larsen's treatment relationship with Dr. Haddad, the context of this statement does not support this suggestion. In context, the ALJ is simply stating that, as of July 2004, Larsen was not on medication, a fact on which the ALJ relies in error.

---

[6] The record indicates that Larsen was on a regimen of Zoloft, Trazadone, and Lithium at the time Dr. Haddad began treating him. (R. at 173.) In fact, Dr. Haddad notes in his evaluation that the medications eliminated Larsen's symptoms "some" and "modestly." (R. at 191.) Despite the improvement the ALJ cites, Dr. Haddad still believed that, after three months of treating Larsen, it would be "difficult" or "impossible" for Larsen to work. (R. at 192.)

Because the ALJ did not properly articulate his reasoning, the Court must find that the ALJ reduced the weight of Dr. Haddad's testimony in error. This failure by the ALJ taints his determination that Larsen did not meet Listing 12.04, as the ALJ has not reconciled evidence that supports Larsen's position. *See Scott*, 297 F.3d at 596 (ALJ must "consider [the claimant's] proffered medical evidence and articulate specific reasons for accepting or rejecting it."). Although the ALJ need not provide a "complete written evaluation of every piece of testimony and evidence," *Rice*, 384 F.3d at 370 (quoting *Diaz*, 55 F.3d at 308), the ALJ has a "duty to acknowledge potentially dispositive evidence" and to discuss conflicting evidence of impairments. *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). Thus, the Court must remand for a complete step three articulation.

### B. The ALJ's Mental and Physical RFC Determinations

#### 1. Mental RFC

In the same vein as Larsen's argument as to the ALJ's treatment of Dr. Haddad's testimony, Larsen argues that the ALJ failed to articulate adequately his reasoning in adopting the DDS physicians' mental RFC findings. Referring to Larsen's mental RFC, the ALJ stated,

> The record warrants adopting the mental residual functional capacity assessments of the reviewing DDS physicians, expert evidence under SSR 96-6p, that claimant's severe mental impairment resulted in "mild" restrictions of daily activities, "mild" difficulties in maintaining social functioning, and "moderate" difficulties in maintaining concentration, persistence or pace, and "no" episodes of decompensation of extended duration (Exhibit 3F) and, further, would only limit his ability to carry out detailed job instructions (Exhibit 2F).

(R. at 17.) As discussed above, Dr. Haddad's opinion was contrary to the DDS physicians' opinions. (*See* R. at 190-94.)

An ALJ may rely upon a DDS physician's opinion in determining a claimant's RFC. 20

C.F.R. § 416.927(f)(2); *see also Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). In

relying on the DDS physicians, the ALJ "must explain in the decision the weight given to the

opinions of a State agency [medical experts]." 20 C.F.R. § 416.927(f)(2)(ii); *see also Cichon v.*

*Barnhart*, 222 F. Supp. 2d 1019, 1030 (N.D. Ill. 2002) ("[The ALJ] failed to explain why he lent

more controlling weight to the findings of the DDS, a non-treating physician's report.").

Here, like *Cichon*, the ALJ adopted the mental RFC conclusions of the DDS physicians

without any explanation as to why the DDS physicians' opinions warrant greater weight. The

ALJ simply stated that the record warrants adopting their assessments. The ALJ does not include

any insight into the various factors that 20 C.F.R. § 416.927(f)(2) directs the ALJ to consider.

For this reason, the ALJ failed to explain his reasoning, and the Court must conclude that the

ALJ failed to build a logical bridge from the facts to the his conclusion.


### 2. Physical RFC

Larsen also argues that the ALJ's physical RFC is insufficiently articulated. Larsen

argues that the ALJ did not provide a function-by-function analysis of Larsen's abilities and

failed to support his finding that Larsen can perform light work with substantial evidence. (*Id.*)

Social Security Ruling ("SSR") 96-8p states in pertinent part,

> The RFC assessment must first identify the individual's functional limitations or
> restrictions and assess his or her work-related abilities on a function-by-function
> basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545
> and 416.945. Only after that may RFC expressed in terms of the exertional levels
> of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. Each function must be considered separately. *Id.*

"The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7; *see also Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Omission of such a discussion is sufficient to reverse the Commissioner's decision. *Briscoe*, 425 F.3d at 352.

Referring to Larsen's RFC, the ALJ stated:

> The record is persuasive that the claimant has the residual functional capacity to perform light work (i.e., lifting up to 20 pounds occasionally and 10 pounds frequently, and standing and/or walking and/or sitting for a total of six hours in a normal 8-hour workday) subject to a mental impairment resulting in a limited ability to carry out detailed instructions.

(R. at 15.) The ALJ's decision properly identified Larsen's impairments on a functional level—the ALJ delineated and quantified Larsen's ability to lift, stand, walk, and sit in an eight-hour work day. The Commissioner's regulations allow the ALJ to combine the activities in the RFC assessment. SSR 96-8p, 1996 WL 374184, at *5. The ALJ also sufficiently engaged in a narrative discussion as required by governing case law. *See Briscoe*, 425 F.3d at 352.

Larsen argues that the ALJ has given "no evidence nor offered any explanation whatsoever as to how or why the claimant can perform 'light work.'" (Pl.'s Mot. at 19.) Although the ALJ does not explain at the point where he identifies Larsen's physical RFC what evidence he considered in coming to this conclusion, the Seventh Circuit requires this Court to consider the ALJ's opinion "as a whole," *Fox v. Heckler*, 776 F.2d 738, 743 (7th Cir. 1985), and to "give the opinion a commonsensical reading rather than nitpicking at it," *Rice*, 384 F.3d at 369 (quoting *Shramek*, 226 F.3d at 811.

- 22 -

The evidence that the ALJ considered in arriving at his physical RFC conclusion is articulated throughout his decision. Initially, the ALJ cited testimony from Larsen himself that gave insight as to Larsen's ability to walk and lift. Also, the ALJ considered Larsen's physical examination with Dr. Tamragouri. The ALJ noted that despite Larsen's complaints of impairments, Larsen's cardiac, lungs, extremities, neurological, and musculoskeletal examinations were normal. (R. at 16.) Dr. Tamragouri observed that although Larsen complained of left leg pain, Larsen did not use an ambulatory assist device while walking. (*Id.*) The ALJ considered evidence favorable to Larsen as well, noting that Dr. Tamragouri diagnosed Larsen with myofascial pain of uncertain significance, chest pain, and shortness of breath. (*Id.*)

The ALJ also considered the medical evidence from Larsen's visits to the Russo Family Health Center. The ALJ observed that the laboratory tests did not return results that support Larsen's pain assertions and that the clinical impressions only mirrored his complaints. (*Id.*) The ALJ also noted that Larsen was diagnosed with polyarthralgia after complaining about his pain in his hands and wrists. (*Id.*)

Larsen's work activities were also considered in the ALJ's decision. The ALJ findings that Larsen's activities of yard and handyman work, selling cars, and working as many as eighteen hours a day contributed to the ALJ's RFC assessment. (R. at 17.)

Reading the ALJ's decision as a whole, the Court is able to identify the evidence that the ALJ relied upon in reaching his RFC conclusions and the reasons the ALJ believed the evidence supported his conclusions. The ALJ has properly built the required logical and accurate bridge between the evidence and his conclusions required by governing case law as well as the Commissioner's regulations.

- 23 -

## C.    The ALJ's Credibility Determination

Next, Larsen challenges the ALJ's finding that Larsen was not credible. (Pl.'s Mot. at 21-23.) Issues as to credibility are properly decided by the ALJ, not this Court; therefore, the Court will not overturn the ALJ's credibility determination unless it is "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Accordingly, the Court "will affirm a credibility ruling as long as the ALJ gives specific reasons that are supported by the record for his finding." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004). Furthermore, the ALJ must examine "the full range of medical evidence" as it relates to the claimant's complaints of pain and impairments. *Zurawski*, 245 F.3d at 888.

Referring to Larsen's credibility, the ALJ states,

> Finally, claimant's testimony of pain, functional limitations, and activities, when compared against the objective evidence and evaluated using factors in SSR 96-7p, was not credible.  The testimony reflects greater physical and mental limitations than shown in the objective evidence which include a 5/5 grip on August 31, 2004 (Exhibit 6F) and working as many as 18 hours a day (Exhibit 1F).  The testimony as to limitations is also inconsistent with his use of medication, pursuit of treatment, and activities.  His testimony of work activity involving yard and handyman work "on and off" also omitted selling cars (Exhibit 8F).

(R. at 17.)

The ALJ's credibility determination is sufficiently supported by the specific reasons that he gives. First, the fact that Larsen scored a 5/5 on a grip test is contrary to portions of Larsen's testimony regarding pain in his hands. Second, Larsen's work activities consisting of yard and handyman work, selling cars, and working as much as eighteen hours a day is not consistent with a claim of disabling impairments, and is contrary to Larsen's statements as to his physical capacities.

- 24 -

Larsen challenges the factual underpinnings of the specific reasons on which the ALJ's credibility determination relies. Specifically, Larsen disputes the ALJ's understanding of Larsen's work history. In his Response, Larsen claims that his working eighteen-hours days took place after high school, before the onset of his disability. (Pl.'s Mot. at 22.)

This Court cannot "decide the facts anew" or "re-weigh evidence." *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It is the ALJ's responsibility to make factual findings and appropriately consider them in his decision. *See Jones v. Shalala*, 10 F.3d 522, 523 (7th Cir. 1993). The Court simply considers whether the ALJ's reasoning is supported by facts in the record. Here, the facts (specifically, Dr. Nemeth's opinion) indicate that Larsen worked up to eighteen hours per day during some periods of his disability. Dr. Nemeth noted in his opinion that "[w]hile [Larsen] continued to have a landscape business, he stated that he bought a pizza parlor for a brief period of time. He stated that he was always very industrious, but became very tired and fatigued after working approximately 18 hours per day on these jobs." (R. at 132.) This evidence supports the specific reason the ALJ gave as to why Larsen was not credible.

Although the specific reasons the ALJ gave that the Court has discussed thus far are supported by the record, the Court must hold that the ALJ improperly considered Larsen's failure to pursue treatment. The ALJ reasoned that Larsen was not credible because Larsen's testimony was inconsistent with his pursuit of treatment and use of medication. (R. at 17.) The ALJ also stated, "While claimant alleges disability since January 1, 2003 due to bipolar and panic disorders, pain in his joints, including ankle, foot and chest pains, the record lacks documentation of claimant seeking treatment in 2003." (R. at 15-16.) The ALJ's reasoning is not in accord with the Social Security Rulings. The Social Security Rulings mandate that an ALJ "must not draw

- 25 -

any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." SSR 96-7p, 1996 WL 374186, at *7. Also, the ALJ must consider religious explanations before drawing a negative credibility inference. SSR 96-7p, 1996 WL 374186, at *8.

The record indicates that Larsen was raised as a Christian Scientist and "[does not] believe in medication." (R. at 169.) The ALJ's opinion failed to account for this explanation as to why Larsen neglected to seek treatment in 2003. Nor is there any indication that the ALJ considered Larsen's religious beliefs in finding that Larsen's testimony was inconsistent with his pursuit of treatment and use of medication. Thus, the Court cannot accept these reasons (i.e., the absence of treatment and use of medication, as well as documentation of Larsen's seeking treatment) as a basis for the ALJ's determination that Larsen was not credible.

Even though the ALJ's credibility determination is not supported by Larsen's failure to seek medical treatment or medication, the Court believes that the ALJ's credibility determination is sufficiently supported by the ALJ's recitation of Larsen's work activities and grip test, both of which are inconsistent with his pain and functional limitations testimony. An ALJ's decision must be supported by more than a "mere scintilla" of evidence, *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993), but "may be something less than the greater weight or preponderance of the evidence," *Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). Because the ALJ's credibility determination was based on substantial evidence, the Court rejects Larsen's argument and finds that the ALJ's credibility determination was proper.

## D. Vocational Expert

Finally, Larsen's Motion includes a brief argument that remand is necessary because the ALJ should have consulted a vocational expert in determining whether Larsen has met step five. In determining at step five that Larsen has the capacity of making an adjustment to work in other jobs in the economy, the ALJ stated, "While claimant has non-exertional limitations, they are not such that they would compromise the wide range of work otherwise available for a person having his younger age, high school education, and exertional capacity." (R. at 18.) The ALJ then relied on the Medical-Vocational Guidelines ("the Grids") as a framework for his decision making. (*Id.*) Considering Larsen's age, education, work experience, and functional capacity, the ALJ found that Larsen could "perform substantially all the requirements of light work" and that Larsen was "not disabled." (*Id.*)

Larsen contends that the ALJ erred in relying on the Grids in light of evidence in the record of Larsen's non-exertional limitations, such as pain, problems with concentration, and difficulty handling objects. (Pl.'s Mot. at 21.) He argues that the ALJ should have consulted a vocational expert to help determine whether a significant number of jobs remain after consideration of his non-exertional limitations. (*Id.*)

Although the Commissioner's regulations "suggest that the ALJ's duty to use a vocational expert is discretionary," *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994), the Seventh Circuit has stated that "in cases where a non-exertional limitation might substantially reduce a range of work an individual can perform, the ALJ must consult a vocational expert." *Id.* Non-exertional limitations include those that "do not depend on an individual's physical strength; i.e., all physical limitations and restrictions that are not reflected in the seven strength demands, and

- 27 -

mental and physical limitations and restrictions." SSR 96-8p, 1996 374184, at *6; *see also* SSR 83-14, 1983 WL 31254, at *4 (stating that most light work jobs require "gross use of the hands to grasp, hold, and turn objects").

Here, the record contains substantial evidence that supports the ALJ's implicit decision that Larsen's non-exertional physical impairments do not have a significant impact on his ability to perform the full range of light work. As discussed above, in light of the ALJ's proper credibility determination, the ALJ properly discounted Larsen's subjective complaints of pain and physical limitations based upon Larsen's testimony and the objective medical evidence. *See Luna*, 22 F.3d at 692 (giving an ALJ's credibility finding "considerable weight" in deciding whether a claimant can perform the work indicated by the Grids). Further, the record contains substantial evidence that any limitation in Larsen's hands was not significant—the ALJ noted that Larsen had performed light handyman and yard work, which indicated the physical ability to do at least light work. Based on this, the ALJ concluded that Larsen's ability to perform light work was not significantly impacted by his pain and hand restrictions.

The ALJ's consideration of Larsen's non-exertional mental limitations was not similarly supported by substantial evidence. Although the DDS physicians' testimony indicates that Larsen's non-exertional mental limitations do not have a significant impact on Larsen's ability to perform light work, Dr. Haddad's opinion—which includes evidence of mental non-exertional limitations such as difficulty concentrating and completing tasks—suggests that Larsen may have difficulty completing the full range of light work. (R. at 192.) As discussed earlier, the ALJ improperly discredited Dr. Haddad's evidence of non-exertional impairments and did not perform an adequate mental RFC assessment. Because the ALJ must reassess Dr. Haddad's opinion, the

Court declines to determine at this time whether the ALJ properly determined that a vocational expert was not needed. *See Zurawski*, 245 F.3d at 889 (finding it "premature" to order testimony from a vocational expert where reevaluation of the claimant's testimony and RFC was necessary). On remand, the Court is confident that the ALJ will properly determine whether a vocational expert is needed in light the impact of Larsen's non-exertional limitations or lack thereof.

## IV. <u>Conclusion</u>

For the foregoing reasons, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion. The Commissioner's motion for summary judgment is therefore denied. Larsen's motion for summary judgment is granted to the extent that this Court reverses and remands the Commissioner's decision, but denied to the extent that Larsen seeks denial and an award of benefits.

### ENTER ORDER:

**MARTIN C. ASHMAN**
Dated: August 30, 2007.                         United States Magistrate Judge

Copies have been mailed to:

ASHLEY S. ROSE, Esq.
Attorney at Law
799 Roosevelt Road
Building 6, Suite 104
Glen Ellyn, IL  60137

Attorney for Plaintiff

MS. MICHELLE M. FOX
Assistant United States Attorney
219 South Dearborn Street
Suite 500
Chicago, IL  60604

Attorneys for Defendant